All right. We're all settled down. Go ahead. Thank you, Your Honors. Good morning, Your Honors. Good morning, co-counsel, or counsel. My name is Jim Ramsauer. I represent Mr. Caballero in this matter. And to fairly state the appeal in this matter, it probably hinges, first of all, there were this was a bifurcated trial. The first part of the trial dealt with telecommunications issues. The second part of the trial dealt with felon in possession of gun and ammunition. To further bifurcate the matter, there are two particular issues, the substantive appeal issues in each of the two areas, and also some Booker issues. I think that in the first area, in the telecommunications area, I think there's an overlap with regard to Booker issues as well. And in sitting down and trying to think about this, you've read Ammoline, so you know you're likely to get an Ammoline. Yes, sir. Not only that, the government also conceded the same to me, or I should say to the court, in the last page of its Ammoline brief, which I don't know whether the court wants me to read it or not, but they do concede that the matter should go back to the district court for resentencing. Good reason not to spend time on it. Yes, sir. Maybe I should go to the substantive issues first of all. With regard to the telecommunications issues, there is a problem. The jury did not hear the loss amount with regard to count number three. This matter should also go back to the court. Is that just a sentencing issue? Yes, sir. It's a sentencing issue. It may also be a possible substantive issue. I had trouble with your sufficiency of evidence arguments. Those are the big substantive issues that could walk your guy out. And I sort of didn't get it from the brief. It looked like there was enough so that under the Jackson test there's sufficient evidence. Maybe you could capsulize it for me, why there isn't. I'm sorry, Your Honor, with regard to what count or counts. Any of them. The telecommunications counts. Yes. Let me go to count number three. And the reason why I think there was a sufficiency of evidence issue is because there is an accusation that telecommunications services were taken from WorldCom. They get involved in all of this testimony. But basically the way I read it is that Mr. Caballero was able to access something called NOE. NOE is a management type program. NOE does not have the capability to activate ESNs on the back of cell phones because we're not allowed to bring phones in, or at least in most district courts I can't show you. But it is a you can see it on your cell phone. It is a built-in unique metal piece. If you have the proper coding, you can go into that ESN and hook up your telephone to a particular phone number. That particular hooking up is done through a program which I believe they called CAAP. CAAP is located in Arizona. It has absolutely nothing to do with River Ray or anything else. That is the main problem I had with count number I believe it was three. Count number four said he is in possession of 15 or more phones with the intent to hook these phones up. The fact of the matter was when the police went into the house, none of the phones were hooked up and all there were were just ESNs that were just blank. Nothing had been done to them. I don't understand the implication of that. It seems like you hook them up when you've got a customer. I was thinking of it from the point of view, say I'm on the jury. Yes, sir. That's what I'm supposed to do under the Jackson test, any reasonable jury test. And I'm thinking, why does this guy have 69 cell phones at his house? Why does he have a bunch of account documents that are not in his name? Why does he have a script for getting a password? Why does he have this stuff unless what he's doing is selling dirty cell phones? Even if they're not hooked up at the time, well, why hook them up until you've got a customer? Physically, Your Honor, he cannot initialize those phones unless he has access, and according to the testimony given by the second person from WorldCom, unless he has access to CAAP, and they will go ahead and hook those phones up. I don't think that was made clear in the testimony. They have evidence of an inordinate number of hookups from his connection at the, I think it was a mall. So it looks as though the phones are being hooked up that are connected to him. Not those phones, not the phones in question, Your Honor. He admitted that he had so-called lit up some phones, but with a different phone company, not this phone company, not WorldCom. And that was what he was on trial for was WorldCom, Your Honor, and there's no evidence of any sort of WorldCom hookup. So he admitted, and in fact, after he'd been taken into custody and taken down to the police department, he admitted to one of the officers. There was an officer, Hertzner, there, who was a computer specialist from the Santa Clara Sheriff's Department. He admitted, yes, I've lit up some phones before, but he did not say he lit up the WorldCom phones.  That's with regard to count three. With regard to count four, the issue is 15 or more phones. Yes, he had 15 or more phones. What they were to be used for, that may be up to the jury. But count three is not there, Judge. Count four, count four was coupled up with a fraud count, and I don't think sufficient evidence was given to show any sort of a fraud charge in this matter. The jury issues, of course, were a couple of additional ones, which are booker-type issues. There was a claim that something slightly over $30,000 was attributable to his activity as to counts three and four. Well, we have since learned that, and it's argued in the brief, that these are issues that have to be determined by a jury. Also, with regard to that's with regard to loss amount under the old or the sentencing guidelines. Also, there is an argument that was made that the $30,000-something or other was a restitution amount. Well, the judge didn't find that to be a restitution amount. The probation officer found that to be a restitution amount. And there's an issue under the recent case of U.S. v. Gunning, and which is about three or four months old out of this circuit, as to whether the judge should have found that amount. The thing that most concerns me in this case really has to do with counts one and two, the possession of gun and ammunition. Mr. Caballero was taken into custody at approximately 1220 in the afternoon. A number of police officers go into his house and search through various things, apparently also search through a backpack. With his name on it. Yes, sir, with his name on it. No doubt about it. Beer can. And numerous items inside the backpack. Numerous items inside the backpack that are attributable to him. No doubt about it. And he says he doesn't know anything about that backpack. He says he didn't know anything about the backpack. But the issue is this, the gun. First of all, there's a stipulation that the gun was stolen. Secondly, there's a stipulation that there are no prints on the gun or on the bullets that are his. So what? Well, here's the thing. Here's the thing that's missing, Your Honor. His backpack. I don't get what the question is, really. Well, first of all, here's the thing, Your Honor. There's no discussion as to whether there are prints on the magazine or not. The magazine is probably the most susceptible item. What's the idea? Somebody planted the gun? Could be. I don't know. It's a possible thing to think about. I don't know either. Judge? The question here is whether any reasonable juror could infer that maybe somebody didn't plant the gun. Maybe it's Alex Caballero's gun. Well, Your Honor. It is in his backpack, after all. The unfortunate thing is that the magazine was not presented in evidence. The magazine, there was no evidence as to whether or not the magazine was printed. The tech representative from the Watsonville police said usually you print. All that does for me is say that if a jury said they had a reasonable doubt, I wouldn't say the jury was nuts. You're arguing things that could establish a reasonable doubt. Maybe somebody planted the gun. Funniest fingerprints aren't on the magazine. Those magazines have smooth metal. You get good prints. That's right, Judge. We've all handled magazines. But it seems like it's just an argument that a reasonable jury could find a reasonable doubt, not that any reasonable juror would have to. Well, there was evidence that the backpack was gone through, that a group of police officers went into the house at approximately 1 o'clock. Officer Hertzner was one of the officers who was in the house. As an addition to my, as part of the record, I also included the transcript parts that had to do with the conversations from Officer Hertzner. Officer Hertzner is in the house at 1 o'clock. Was there any discussion? Did any of the officers say, hey, I found a gun? There was no discussion whatsoever, one, during the period at 1 o'clock by any of the officers that they found the gun, two, during the questioning of Mr. Caballero at 2 o'clock or 3 o'clock when he was taken to the police department. And the gun shows up first when the tech goes in at about 6.20 in the afternoon. And the tech spends all of about five minutes before she circles in and finds the gun in the front flap of the, excuse me, the front flap of the backpack. The front flap of the backpack had been open and apparently searched when the police officers first came in. No gun then. There's a gun at 6 o'clock. Either the officers were extremely sloppy or something had happened. I don't know, Judge. But that was the thing in doing this that first struck my attention. And all of you know, if I'm on that jury and Caballero takes the stand and says that's not my backpack, I'm not listening to anything else he has to say about that. It would be one thing if he said, sure, that's my backpack and that the invoice is mine and the personal stuff in there is mine, but that's not my gun and I don't know how the darn thing got there. He denied he said that's not my backpack. But he also denied the gun, Your Honor. And he was also later seen. I'm just saying when a reasonable juror hearing him say that's not my backpack, when it's got his name on it and all of this stuff inside it, might say, you know what? I'm not going to believe the rest of what he has to say about this. I'm not going to believe it when he says he didn't know how that gun got in there. I think the jurors had a lot of questions, and that's evident by the number of jury questions that went back and forth that are part of the record that I submitted. I think that was a real issue for them. And I think that if the police officers went through a backpack, they would have found the gun at 1.30 or 2 o'clock and not at 6 o'clock. So are you inferring the police put it there? I don't know. I have no idea, Your Honor, but I think that's a very reasonable, possibly a reasonable assumption. I guess you also have to assume that the police planted that letter from Columbia House, the club where he buys his CDs. I am — well, Your Honor, I've made my argument, probably not as clearly in the brief. But there was no — there was no printing done on the magazine. You've been through all of this. I, you know, I think that issue has probably pretty much been addressed. That was really clever of the police to plant a bill from a record club. Well, no, that's not the issue as to the other items. The really — the only issue is the gun. That makes it his backpack. Well, it can be his backpack, but it may not be his gun, Your Honor. But — Well, why would he say it was not his backpack? He clearly denied it wasn't his gun. Well, he's not answering. I don't know, Judge. I have — I don't know why he would say it was not his backpack. You may want to save a little time for rebuttal. Thank you, Judge. I'm sorry. I was trying. We should have submitted this on Saturday. Good morning. Barbara Valliere on behalf of the United States. I'd like to clarify a few points, if I may. The first is about the Ameline remand. Counsel had stated that we had conceded that a resentencing was necessary. I don't think that's what our letter says. Our letter says that we are agreeing that, based on the record here, we agree that there needs to be a limited remand under Ameline 3 for the purposes of determining whether or not the district court judge would have imposed the same remand. I think we understand. Thank you. I just wanted to make that clear for the record. With respect to a couple other points I'd like to clarify with respect to the sufficiency arguments. A defense counsel can always move to expand the nature of the remand if they think there's a basis for doing that. But we understand the government's position. Thank you, Your Honor. With respect to the sufficiency arguments on counts 3 and 4, I think that our brief pretty much explains all of the evidence that was submitted at trial that supported both the possession count on possession of the cell phones with the intent to defraud and also the use of the software. But I just want to make clear. I understand your opponent's argument. I think it is that he intended to defraud someone other than WorldCom. Actually, Your Honor, the evidence showed that he intended to defraud WorldCom because the use of the software, the NOE software or the NOE software, was to go into that particular service to light up phones that were from WorldCom. In other words, there were many different kinds of cell phones that were found in his house. I think actually of the 69 cell phones. I thought he was saying he has a soft spot for WorldCom. He's just lit up other companies' phones. And you're saying the software that he had is just for WorldCom? That it actually was for WorldCom, Your Honor. That's my understanding of the testimony. And the other piece of, I think, the defense counsel's argument was. Maybe he figured that WorldCom had so many problems that they overlooked something like this. Could be, Your Honor. There is a piece, however, that I'd like to explain because I think the testimony is actually clear on this point. The software that is used is the National Order Entry System. What the officers found in his house was a password and a six-digit number that were either appropriated or at least being used, unauthorized use of those, a particular password and the username, to enter the National Order Entry System to access customer information. The customer information was already in existence on the software because these individuals had already activated one cell phone line. The WorldCom employee, Mr. Gansas, testified that additional phone lines could be activated once you accessed that site. So what the defendant did here was actually access the site, and based on the evidence that we found in his condo, thereby gain access to this customer information so that he could access additional lines. The accessing or activating of the phones happened when he had accessed, through the National Order Entry System, he had accessed that site, pulled up the information, and then entered in what's called the ESN or the electronic serial number, which is located on the back of the phone. Once that happens, he enters that number into the NOE system. It automatically triggered the CCAP system to activate the phone. So the argument that he had no access to the CCAP system was actually inaccurate. Once he had entered in that ESN number, it would automatically activate the phone. In addition, I think counsel had said that the CCAP was located in Arizona. Actually, it's the NOE that's located in Arizona. The CCAP was, according to the testimony, located in New York. The point of that testimony, of course, was just to show the interstate commerce nexus. I think that with respect to the possession count, Judge Kleinfeld, I think, outlined the evidence pretty clearly, which is that there was 69 cell phones that were strewn about his house of different kinds and makes. There was also purchase or WorldCom purchase agreements in the names of others that were found in his apartment, I mean, in his condo. The testimony from the WorldCom, Ms. Buffalo, who was a WorldCom representative, was that if you, in fact, put in the ESN number and so you activate a phone, there's automatically a customer service agreement that's printed out. So the evidence of those customer service agreements in his apartment was actually evidence that he had activated phones. In addition to that, there was his own admission to the police officers at the time he gave the interview that afternoon that he was involved in activating cell phones. And lastly, there was testimony from his girlfriend, Ms. Medina, that he had in the past used personal information that he had appropriated from her, her Social Security number, her birth certificate, some bank statements, in order to activate phones in her name and she had received and actually to charge phone calls to her name. So we think that all of that evidence, in addition to the evidence that was admitted and listed in our brief is more than sufficient to establish counts three and four. With respect to the 922G count, I think that, again, it's fairly clear that as the court stated that when the police executed the search at 6 p.m., they found the backpack on the counter. In the backpack they found, which of course was stenciled with the defendant's initials of his nickname, they found mail matter addressed to him, including a probation letter. They found a Palm Pilot cover, which matched the Palm Pilot, that was upstairs in his loft area next to his computer charging at the time they were executing the search. They found a binder in the backpack, which contained that information that his girlfriend had claimed had been misappropriated from her, including her Social Security number and also bank statements of hers. They also found, probably most interestingly, undeveloped film in his dining room next to his kitchen, that when they developed the film, they had a picture of the kitchen, which included the backpack in the same location on the counter as it was when they executed the search and at that time in the backpack, according to the photograph, there were cell phones, brand new cell phones that were sticking out of it and those were cell phones, matched cell phones that they found in other parts of the apartment that belonged to or that were attributed to Mr. Caballero later on. So the backpack had clearly been there for some period of time. In addition, there was, of course, evidence that he was alone in the house at the time they executed the search and, excuse me, at the time they arrested him, and that the backpack had not moved from the counter. I just want to address one point that counsel raised about the search. There was testimony that the officers had approached the backpack prior to the time they got the search warrant. However, there's no testimony, and that includes Mr. Herzer's testimony, if the Court looks more carefully at it, that anyone had actually gone through the backpack itself. The testimony was that there were things sticking out of it and some of it was open, but it was Officer Carlin, who was the crime scene search officer, who testified that she, in fact, discovered the weapon at 6 o'clock after they had executed the search warrant. The point of that, of course, is that the plant defense that was offered at trial through the defendant's testimony was not supported by Officer Herzer's testimony, as the defendant claims. What about the testimony of the ATF agent? Your Honor, you're referring, I think, to the testimony about whether or not the --- The absence of getting a report back when they sent a weapon in. This is the so-called expert witness testimony. The officer testified, and I think the Court needs to look specifically at what it was that he was allowed to testify to. At the end of his testimony, the prosecutor asked him whether or not he was cognizant of other ATF agents sending weapons off for testing, and the response, he said yes. And then the prosecutor asked him a question about whether or not he had heard from, or after speaking with him, did he know whether or not there were any positive results, and the officer testified that he had never heard of any positive results. The objection to that below was a hearsay objection. The question presented to this Court is really whether or not the officer was qualified as an expert to offer such hearsay testimony. I think it is debatable as to whether or not that response itself is hearsay. Does it matter? I mean, an expert can't offer hearsay, but he can rely on hearsay in forming an opinion. That's correct, Your Honor. And I think that under this Court's case in Kristoff, the Court had recognized earlier that certain agents or there's certain skilled experts that are allowed to testify in that case to the fact that there were only fingerprints taken off 10 percent of weapons. I think this case, again, I think that it's a little bit, it's a close call as to whether or not, it's a close call as to whether or not this is admissible testimony, whether or not this is an abuse of discretion. If you want to answer a bar exam, that that would be admissible. I actually think that, I agree with you, Your Honor, that it's a close call in this particular case. But I also have to say that it's clearly. Let's see how you could get it in unless you got it in with an admonition that it's not for its truth, it's just for exposing a basis on which the expert formed an opinion. I think that's correct, Your Honor. I don't think you got an admonition like that, but I still don't understand why it matters. Well, it doesn't matter in the big picture, Your Honor, because it's so clearly harmless in this case. In this particular case, immediately after that testimony, the defense counsel asked him whether or not he was saying, is this, are you saying. What was he an expert on? Actually, I think that the term that was used in the Kristoff case was not expert so much as skilled witness under Rule 702. And so it was recognizing that there are not just scientific experts, but there are also certain kinds of witnesses like police officers or FBI agents who are often skilled and have experience about matters beyond their own, in this particular case, beyond his own submission of the weapons. I'm not sure that this falls directly within that, Your Honor. But I think that in the Kristoff case, the testimony that was omitted was even, was arguably even greater hearsay than that here. But in any event, I don't think the Court has to actually answer this question because it's so clearly harmless in this particular case. Oh, I don't think we do. I'm just curious. No, and I think that the only support I found for it was that Kristoff case. Quick question I'd like to ask you is this. Now, he went, he got a long sentence, didn't he? He got about, I think it was 90 months, Your Honor, and then a concurrent 25 months for the cell phone counts. Does he get to take a cell phone with him when he's in prison? You know, I don't know the answer to that question, Your Honor. I don't think it would be a good idea in this case. Get that opportunity. They call it hard time. Yes. You could give him a couple dozen. He could light them up. He seems to be able to have access to them, so hopefully not now. If there are no further questions from the Court, we would ask that you affirm. Thank you. Thank you. Your Honors, first of all, in my excerpt of records at page 20, just to make it clear, officers did go into the house before the Watsonville evidence expert went in at 6 o'clock. And page 20 is otherwise known as 953 of the reporter's transcript. And Sergeant Hertzner, particularly at line 23, makes it very clear that the officers were searching through the house, and that included the backpack. To move on to the next item, the ATF agent was qualified as an expert who could testify that guns do not hold fingerprints. If that was the case, we wouldn't have an FBI fingerprint lab, an ATF fingerprint lab. I thought that was just a gift to you. They had such an easy, solid case, and then they have this expert bloviating way beyond what's necessary to win it and enable you to punch some holes. It struck me your only chance in this case was their overdoing it with the expert. Actually not, Justice. I think the real question is, and what perhaps should be looked at more carefully, is there was all this effort made with regard to the bullets and the gun, and a stipulation that there were no prints or identifiable prints, but what is dropped out and what is not discussed, and apparently what has not been put forth as evidence, and it may be a Brady issue, is whether or not the magazine itself was printed. And, of course, for experts, we'll tell you the magazine actually. That's what I meant. The expert's falling all over himself to say, oh, the no prints doesn't mean a thing. You don't get prints from guns in almost all the cases. And, of course, the magazine's smooth. You can get prints from cleaning a gun. It's hard to keep the prints off the magazine. But you know, Your Honor, the magazine wasn't put into evidence, and there was no evidence as to prints on the magazine. And I don't know what the evidence would have been with regard to prints on the magazine. There was a magazine in the backpack. Yes. There was a magazine, Your Honor. Inside the magazine were the bullets, and then there was the weapon itself inside the backpack. Were they loose bullets? Well, that's the trial issue. The gun, you know, was shown to have been stolen from someplace in the Central Valley. There was a stipulation, however, that my client or the other gentleman in the house did not steal the gun. All right. Thank you very much. Thank you. The matter will stand submitted. Now we'll come to the last case, which is U.S. versus Trejo Ramirez. Thank you.
judges: Pregerson, Kleinfeld, Hawkins